UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 9 / 8 / 15

YILVER MORADEL PONCE,       CIVIL ACTION
    Plaintiff       SECTION "P"
     NO. 1:10-CV-01478
VERSUS

VIRGIL LUCAS, et al.,       JUDGE JAMES T. TRIMBLE
    Defendants       MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a civil rights complaint filed pursuant
to 42 U.S.C. § 1983, in forma pauperis, by pro se plaintiff Yilver
Moradel Ponce ("Ponce") on September 24, 2010 (Doc. 1) and amended
on November 30, 2010 (Doc. 4).  Ponce contends that, while he was
confined in the Winn Correctional Center ("WCC") in Winnfield,
Louisiana in 2010, he was subjected to unconstitutional and
unreasonable strip and visual body cavity searches.[1]  The named
defendants are James LeBlanc (Secretary of the Louisiana
Department of Public Safety and Corrections), Jack Garner (owner
or president of Corrections Corporation of America ("CCA"), which

---

[1] Ponce's claims of sexual harassment, breach of contract, failure to hire, and
unsanitary conditions in the room in which he was searched have been dismissed
(Docs. 12, 24).

1

operates WCC), Timothy Wilkinson (former warden of WCC), Jay Tim Morgan (current Warden of WCC), Virgil Lucas, (Chief of security at WCC), and several security officers employed at WCC-"Mrs. Millie," Mr. Sawyer, Mr. Johnson, Sgt. Flowers, and "Mr. Mac."[2]

Carol Melton,[3] Johnson, Flowers, McGloughlin, CCA,[4] Virgil Lucas, Jack Garner, and Jay Time Morgan answered the complaint (Docs. 26, 33, 44, 45, 62). Ponce filed a motion for partial summary judgment (Docs. 27, 66) with documentary evidence and affidavits (Docs. 38, 55, 56), and defendants filed briefs and evidence in opposition to the motion (Docs. 51, 68).

Ponce's motion for summary judgment is now before the court for disposition.

<u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure mandates that the court shall grant a summary judgment:

> "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] Defendants Sawyer and Moran were never served and have not made a general appearance. Accordingly, the complaint against these defendants should be dismissed. Fed.R.Civ.P. 4(m). See <u>McGinnis v. Shalala</u>, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); <u>Systems Signs Supplies v. U.S. Dept. of Justice</u>, 903 F.2d 1011, 1013 (5th Cir. 1990); <u>Kersh v. Derosier</u>, 851 F.2d 1509, 1512 (5th Cir. 1988).

[3] Although defendants did not explain who "Carol Melton" is, apparently she is "Mrs. Millie." See Hicks v. CCA, Case No, 10-cv-00020 (W.D.La.).

[4] CCA was not named as a defendant, although an answer was filed on its behalf, so it will not be considered as a defendant in this action.

Paragraph (e) of Rule 56 also provides the following:

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is

3

no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial.    In this analysis, we review the facts and draw all inferences most favorable to the nonmovant.  Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989).   However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment.  Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82 (1992).

Law and Analysis

Visual Cavity and Strip Searches

Ponce contends the visual body cavity and strip searches he was subjected to at WCC violated the Fourth Amendment.   Ponce complains that he works the morning and afternoon shift in WCC's P.E. Garment Factory, and that he and other garment factory workers are forced to submit to visual body-cavity searches at least twice a day (Doc. 4).   Ponce contends the searches were unreasonable because they were done after the tools were turned in, and strip searches are not conducted in the other hobby shops (Doc. 4). Ponce contends the inmates also had to pass through a metal detector (Doc. 4).  Ponce argues that it is unreasonable to suspect him or anyone else of concealing garment factory products in their genital or buttocks areas, that defendants do not have reasonable

4

cause to conduct the visual body cavity searches, and that the searches are illegal and constitute sexual harassment (Doc. 4).

Ponce also complains that the strip searches are not documented as required by Louisiana Department of Corrections ("DOC") regulations (Doc. 4).   Ponce contends he has been threatened with disciplinary action unless he submits to the strip searches.

1.

The inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute.  The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.  Bell v. Wolfish, 441 U.S. 520, 562, 99 S. Ct. 1861, 1886 (1979).  The Fifth Circuit has stated that it "is required, as a matter of both common sense and law, to accord prison administrators great deference and flexibility in carrying out their responsibilities to the public and to the inmates under their control, including deference to the authorities' determination of the 'reasonableness of the scope, the manner, the place and the justification for a particular policy.'"  Elliott v. Lynn, 38 F.3d 188 (5th Cir. 1994), cert. den., 514 U.S. 1117, 115 S.Ct. 1976 (1995), citing Hay v. Waldron, 834 F.2d 481, 486 (5th Cir. 1987).

Prison officials are entitled to wide-ranging deference for their policies designed to maintain institutional security.  Bell, 441 US at 558, 99 S.Ct. at 1884.  Under appropriate circumstances, visual body cavity searches of prisoners can be constitutionally reasonable.  Johnson v. Scott, 31 Fed.Appx. 836, **1 (5th Cir. 2002), citing Elliott v. Lynn, 38 F.3d 188, 191 (5th Cir. 1994).

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  Bell, 441 U.S. at 559, 99 S. Ct. at 1884, and cases cited therein.

The Court in Bell stated, "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record …and in other cases."  Visual body-cavity inspections conducted in the manner contemplated by the prison rules can be conducted on less than probable cause and do not constitute punishment since they are reasonable responses to legitimate security concerns.  Bell, 441 U.S. at. 1885-1886, 99 S.Ct. at 559.

6

A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs. Moore v. Carwell, 168 F.3d 234, 236-37 (5th Cir. 1999), citing Elliott, 38 F.3d at 190-191. When evaluating the security policies adopted by the prison administrators, the court is not required to apply a least restrictive means test. Elliott, 38 F.3d 188, 191 (5th Cir. 1994) (visual body cavity searches were conducted in full view of the entire dorm), citing Hay, 834 F.2d at 485.

Visual cavity searches are necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution. Bell, 441 US at 558, 99 S.Ct. at 1884. In Elliot, the Fifth Circuit found a collective strip search of all inmates in an institution-wide shakedown, in a large, non-private room and in the presence of extra guards, was constitutionally reasonable. See also, Montgomery v. Johnston, 184 F.2d 816, *1 (5th Cir. 1999)(strip searches are reasonably related to the legitimate penological interest in security); Kelley v. Handorf, 96 F.3d 1442, *1 (5th Cir. 1996)(strip searches in non-secluded areas of prisoners classified as assaultive are reasonably related to the legitimate penological interest in security); Clark v. Collins, 5 F.3d 1494, *2 (5th Cir. 1994) (prison officials may constitutionally conduct strip searches to maintain prison

security; Hay, 834 F.2d at 486 (routine strip searches of inmates going in and out of the segregated housing unit was reasonably related to legitimate security needs to prevent the transfer or concealment of prison contraband).

2.

Ponce contends that he and other inmates in the Garment Factory were frequently strip-searched and subjected to visual body cavity searches by defendant Johnson, whom Ponce contends is openly homosexual.

As previously held in this case, Ponce has not stated a claim for sexual harassment, and that claim has been dismissed (Docs. 12, 24).   Ponce's claims as to being strip-searched in an unsanitary room was also dismissed (Docs. 12, 24) and will not be discussed herein.

3.

Ponce contends that he and other inmates in the Garment Factory were strip-searched and subjected to unnecessary and unreasonable strip and visual body cavity searches twice a day. In his affidavit (Doc. 56), Ponce contends that defendants admitted in their discovery responses that the daily strip and visual body cavity searches were not documented.   Ponce also points out that, since another inmate's trial on this issue, the garment factory daily strip searches have been discontinued in favor of pat downs and use of the metal detector (Doc. 56).

8

Ponce contends the strip and visual body cavity searches were conducted after all of the tools had been accounted for, were conducted without notice or consent, were without legal or penological justification, were not conducted in the other hobby shops (including the one where knives were made), and were not properly documented in accordance with CCA and DOC policy (Doc.52). Ponce also contends the searches were unnecessary since there was a tool count before the searches and the inmates had to pass through metal detectors.

Defendants submitted affidavits from Becky Dougan, Carol Melton, Joshua Clark, and Warden Tim Morgan (Doc. 51). Defendants show, in the affidavit of Becky Dougan, the director of the Prison Enterprises Garment Factory at WCC, that she is the "plant manager" of the facility and Carol Melton and Joshua Clark provide security for the WCC Garment Factory (Doc. 51, Ex.). Defendants further show in affidavits by Dougan, Melton, Clark, and Warden Morgan that the Garment Factory contains sewing machines, cutting tables and other devices, and that a Culinary Arts class and a Carpentry class are in the same building as the Garment Factory (Doc. 51, Ex.). Dougan states in her affidavit that inmates assigned to work in the Garment Factory may ask to be "reclassified" so they may work somewhere else, and that requests for reclassification are routinely approved (Doc. 51, Ex.).

Dougan, Melton, Clark, and Warden Morgan state in their affidavits that, each day, over eighty inmates work in the Garment Factory with sewing machines, needles, scissors, specialized clippers, other tools, machines, nails, electrical cords, and other items (Doc. 51, Ex.). Dougan states in her affidavit that the cutting room area and the tool room, which houses hand tools, are partially secluded; inmates check out tools by retrieving them and leaving their ID card hanging on the nail from which they retrieved the tool (Doc. 51 Ex.). Dougan, Melton, Clark, and Warden Morgan explain in their affidavits that the Culinary Arts and Carpentry classes also use tools, and that there is a sally-port adjacent to the Garment Factory where supply trucks are unloaded and civilian drivers (who are not searched) mingle with the inmates unloading the trucks; also, trustee inmates who work outside the prison leave and re-enter the facility daily through the sally-port, and inmates in the Garment Factory mingle with the trustees during smoke breaks (Doc.51, Ex.). Dougan, Melton and Clark further explain in their affidavits that all three areas, the Garment Factory, Carpentry, and Culinary Arts, break for lunch near the lunch hour on a staggered basis and, to eat lunch, inmates must re-enter the main prison area through the Cypress Exit door to go "on the walk"; before being allowed to re-enter "the walk" through the Cypress Exit, all tools from each area must be returned and properly stored, then each inmate must be visually strip-

searched, then pass through a metal detector (Doc. 51, Ex.). Dougan, Melton, Clark and Warden Morgan state in their affidavits that the same security procedures (tools confirmed returned, strip search, metal detector) are used at the close of the work/vocation day, and whenever inmates have to leave the Garment Factory building for reasons such as medical appointments, classes or other scheduled events (Doc. 51, Exs.). Dougan, Melton and Clark state in their affidavits that some inmates, such as insulin-dependent diabetics, have to be searched every day when they leave for their daily medical appointments (Doc. 51, Exs.).

Dougan, Melton, Clark and Warden Morgan further state in their affidavits that that prison "counts" of every inmate at the facility take place several times each day; if the numbers do not match, then every inmate must immediately be returned to his bed for a "bed count," which is conducted rapidly to confirm the presence of inmates in the facility (Doc. 51, Ex.). When there is a bed count, the Garment Factory area is cleared of all inmates quickly (Doc. 51, Ex.).

Dougan and Melton state in their affidavits that females do not participate in the strip searches, that Dougan and Melton never participated in the searches, and the room used for strip searches has windows on each side for security purposes (Doc. 51, Ex.).

Melton and Clark state in their affidavits that inmates walked through the metal detector one at a time, and that it would

11

sometimes malfunction; it might go off when there was no one inside it and it could sometimes fail to detect the presence of small amounts of metal, such as the metal clasp on a name badge (Doc. 51, Ex.).  Melton stated that wood scraps from the Carpentry shop, plexi-glass from the Garment Factory, and contraband such as drugs, stolen clothes, money and cell phones would not set off the metal detector (Doc. 51, Ex.).  Melton points out in her affidavit that inmates in the Garment Factory (as well as inmates in the Carpentry and Culinary Arts classes) posed risks because they were all in routine contact with civilian trucks, truck drivers and trustees, they all worked daily with items that could easily be concealed and turned into weapons, and the metal detector would sometimes malfunction and do not detect non-metal items (Doc. 51, Ex.).

Melton and Clark state in their affidavits that Garment Factory inmates were searched in groups because it was more efficient, and the searches were conducted because of the operation of the prison enterprises Garment Factory and in order to meet the security needs of WCC (Doc. 51, Ex.).

Clark states in his affidavit that inmates work four ten-hour days, with smoke breaks and a lunch break (Doc. 51, Ex.).  Clark further states in his affidavit that strip searches are conducted at the Garment Factory in groups of about ten inmates at a time, who are segregated into a specific room (measuring 30' X 12.5') that is used to conduct the strip searches (Doc. 58, Ex.); that

12

room has windows next to the entry and exit doors (Doc. 51, Ex.).

Clark and Warden Morgan state in their affidavits that, during

searches, inmates put their clothes on two long, narrow tables in

the middle of the room; the tables are between the searching

officers and the inmates (Doc. 51, Ex.).  The visual searches are

conducted by at least one uniformed corrections officer plus one

or two corrections personnel trained in conducting search (Doc.

51, Ex.).  Inmates to be searched are arranged in the room,

collectively instructed to disrobe and place their clothes on the

tables, the officers search their clothes, and each inmate is

instructed to spread his buttocks, lift his genitals, and open his

mouth for visual searches of those areas; a change in procedures

at one point required inmates to squat and cough rather than spread

buttocks and lift genitals (Doc. 51, Ex.).  Clark states in his

affidavit that inmates are never physically touched by the

corrections personnel during the searches (Doc. 51, Ex.).  On

completion of the searches, the inmates partially re-dress in the

search room (at a minimum they put on their boxer shorts), then

they exit and finish dressing on two benches in the hallway (Doc.

51, Ex.).  Warden Morgan, Melton and Clark state in their

affidavits that, once the inmates are re-dressed, they walk through

the metal detector one at a time (Doc. 51, Ex.).

Clark further states in his affidavit that he has personally

found marijuana, stolen clothes, cell phones and money during the

13

strip searches, and that metal shanks have been found hidden in the Garment Factory (Doc. 51, Ex.).

Warden Morgan states, in his affidavit (Doc. 51) that searches are necessary to prevent weapons and contraband from moving from the Garment Factory to the main prison area. Warden Morgan further states in his affidavit that the Garment Factory strip searches are conducted "privately," in accordance with Department of Corrections policies, because the inmates being searched are in a separate room, no females are present, and the inmates are partially redressed before stepping into the hall to finish redressing; Warden Morgan points out in his affidavit that the inmates are routinely nude in front of corrections officers when they shower or use the bathroom (Doc. 51). Warden Morgan states that the windows are required in the search room (and in other places such as bathrooms) are required for security purposes, to ensure that nothing improper is happening and in the event a hostage situation takes place (Docs. 51). Finally, Warden Morgan points out that routine strip searches may take place at any time, without the requirement of reasonable suspicion, and that visual body cavity searches may be conducted routinely without reasonable suspicion when an offender is entering or leaving the facility for work detail or after the offender participates in any physical contact (Docs. 51).

First, it is noted that Ponce does not allege excessive force or any injury resulting from the strip or body cavity searches. Under 42 U.S.C. § 1997e(e), an inmate cannot recover for mental and emotional injury suffered while in custody without a prior showing of physical injury.  The rule in the Fifth Circuit is that in the absence of proof of actual, compensatory damages, a plaintiff who has been deprived of his constitutional rights may only collect nominal damages.   However, the Fifth Circuit also adheres to the general rule that a punitive award may stand in the absence of actual damages where there has been a constitutional violation.  Louisiana Acorn Fair Housing v. LeBlanc, 211 F.3d 298, 303 (5th Cir. 2000), cert. den., 121 S.Ct. 1225 (U.S. 2001).  Also, Carey v. Piphus, 435 U.S. 247, 255-56, 98 S.Ct. 1042, 1047-48 (1978).

Second, the CCA and DOC rules and regulations regarding documentation of strip and body cavity searches do not create federally-protected rights in inmates for compensation when prison officials violate those rules.   The narrowing of prisoner due process protection announced in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995), left plaintiff without a federally-protected right to have prison regulations enforced by federal courts.   Any right of that nature is grounded in state law or regulation and the mere failure of an official to follow state law or regulation, without more, does not violate constitutional

minima.  Baker v. McCollan, 443 U.S. 137, 146-47, 99 S.Ct. 2689, 2695-2696 (1979); Murray v. Mississippi Dept. of Corrections, 911 F.2d 1167, 1168 (5th Cir. 1990), cert. den., 498 U.S. 1050, 111 S.Ct. 760 (1991).  Also, Jackson v. Cain, 864 F.2d 1235, 1251-1252 (5th Cir. 1989).  Therefore, Ponce's allegations that defendants did not properly document the searches do not state a claim for violation of his constitutional rights that is cognizable under Section 1983.  Neitzke v. Williams, 490 U.S. 319, 109 S.Ct. 1827 (1989).  See Ordaz v. Martin, 5 F.3d 529, *9 (5th Cir. 1993).

Third, Ponce complains the visual body cavity searches were not conducted by medical personnel as required by prison regulations, and shows that body cavity searches were not permitted under CCA regulations without prior approval.  See CCA Policy 9-5.5(D) (Doc. 51).  However, only physical body cavity searches had to be conducted by medical personnel.  Ponce has not alleged or shown that he was subjected to physical body cavity searches.

Ponce also complains the searches were not conducted in accordance with CCA and DOC policies.  Warden Morgan shows in his affidavit that both the Department of Corrections and CCA had policies in place in 2009-2010 regarding strip search procedures, which authorized the strip searches and the visual body cavity searches that were conducted in this case.  See DOC Department Regulation No. C-02-003(7)(E), (F) (Doc. 51).  Prison officials do not have to conduct strip searches of a large group of prisoners

16

on an individual basis.  See <u>Elliott</u>, 38 F.3d at 191.  Under the
facts and circumstances of this case, the Garment Factory searches
at WCC appear to have been conducted in a reasonable and efficient
manner designed to prevent the transportation by inmates of tools,
material for weapons, money, phones, and garments from the Garment
Factory to the main are of the prison.  Ponce has not alleged a
Fourth Amendment violation for the manner in which the searches
were conducted.

The record also contains substantial evidence that the strip
search and body cavity search policies at WCC are reasonably
related to well known, common-sense, legitimate penological
objectives in prison security.

Finally, the Fifth Circuit ordered this court to consider the
factors enunciated in <u>Watt v. City of Richardson Police Dep't</u>, 849
F.2d 195, 196-197 (5th Cir. 1988) (citing Bell, 442 U.S. at 559,
99 S.Ct. at 1884),[4] balancing the need for the searches against

---

[4] As previously stated, <u>Watt</u> involved a police strip search of a
woman who had been arrested on an outstanding warrant for failure
to register her dog in the City; the strip search was conducted
just before she posted bail and was purportedly justified by the
fact that she had been convicted of a minor offense the previous
year.  The court in Watt reasoned that "[r]easonableness under the
Fourth Amendment must afford police the *right* to strip search
arrestees whose offenses posed the very threat of violence by
weapons or contraband drugs that they must curtail in prisons" and
distinguished strip searches of arrestees charged with serious
crimes and prison inmates from strip searches of arrestees charged
with minor offenses.

the invasion of the inmates' personal rights, the manner in which
the searches were conducted, the justification for the searches,
and the places in which the searches were conducted.  In summary
of the discussion of this case set forth above, (1) Ponce's privacy
rights were outweighed by the prison's need to strip search inmates
who have access to materials and outsiders, to prevent the
transportation of weapons, materials for weapons, cell phones,
stolen garments, and money by the Garment Factory inmates into the
main area of the prison (compare Bell, 441 U.S. at 558-559, 99
S.C. at 1884-1886; Elliott, 38 F.3d at 191); (2) the manner in
which the searches were conducted, in groups of ten in a separate
room, efficiently and quickly accomplished the objective of
searching a large number of inmates (compare Elliott, 38 F.3d at
191-192); (3) the searches were justified by a legitimate
penological interest in prison security, to prevent the
transportation of contraband and weapons into the main area of the
prison (compare Bell, 441 U.S. at 1885-1886, 99 S.Ct. at 559;
Montgomery, 184 F.2d at *1)); and (4) the searches of the groups
of ten were conducted in the relative privacy of a small separate
room that had two security windows for guards to see through
(compare Elliott, 38 F.3d at 191).  Therefore, the prison's strip
and visual body-cavity searches of inmates in the Garment Factory
were justified and reasonable.

Since there are no genuine issues of material fact which would preclude a summary judgment in favor of defendants, Ponce's motion for summary judgment should be denied and a summary judgment should be granted in favor of defendants.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Ponce's motion for summary judgment (Docs. 27, 66) be DENIED, that a summary judgment be GRANTED in favor of all defendants, and that Ponce's action be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. *No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.* Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,**

**FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of September 2015.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE